**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

**MARK YOHPE,**

**Plaintiff,**

-vs-                                                    **Case No.  6:06-cv-591-Orl-UAM**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Mark Yohpe ["Yohpe"] appeals to the district court from a final decision of the

Commissioner of Social Security [the "Commissioner"] denying his application for disability

insurance benefits and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the

reasons set forth below, the Commissioner's decision is reversed and remanded pursuant to sentence

four of 42 U.S.C. § 405 (g).

**I.      PROCEDURAL HISTORY**

On August 22, 2003, Yohpe filed a claim for disability insurance benefits and supplemental

security income benefits,[1] claiming disability as of July 28, 2002 due to complaints of pain resulting

from a motor vehicle accident in 1999.  R. 55-56.  Yohpe was insured for disability insurance benefits

---

[1]According to the ALJ, Yohpe, and the Commissioner, Yohpe filed an application for supplemental security income benefits on August 22, 2003 claiming disability as of July 28, 2002.  *See* R. 10, 16, 246; *see also* Doc. Nos. 22, 25.  The record contains only Yohpe's application for disability insurance benefits.  *See* R. 55-56.

through December 31, 2006.   R. 49, 53.   Yohpe's claims were denied initially and upon

reconsideration.   R. 16, 26-27.[2]

On October 18, 2005, the Honorable Judith A. Showalter, Administrative Law Judge ["ALJ"],

held a hearing on Yohpe's claim in Daytona Beach, Florida.   R. 244-83.   Attorney Richard Swartz

represented Yohpe at the hearing.   R. 244.   The ALJ heard testimony from Yohpe and Donna Mancini,

a vocational expert.

On October 26, 2005, the ALJ issued a decision that Yohpe was not disabled and not entitled

to benefits.   R. 16-24.   Following a review of the medical and other record evidence, the ALJ found

that Yohpe could not perform his past relevant work as a design drafter, cartographic designer,

machinist, office manager, and community equipment service repairer.   R. 23, Finding 6.   The ALJ

found that Yohpe nevertheless retained the residual functional capacity ["RFC"] to perform "a

significant range of sedentary work."[3]   R. 20, Finding 5.   The ALJ also found that Yohpe could

occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could never climb

ladders, ropes or scaffolds; was "limited in pushing and pulling with his upper and lower extremities

and in reaching, handling, fingering, and feeling"; and that he needed to avoid concentrated exposure

---

[2]Again, the record appears incomplete.   It includes only the Social Security Administration's ["SSA's"] denial of Yohpe's disability insurance benefits claim, and not his supplemental security income benefits claim.   *See* R. 26-27. Documents related to the SSA's denial upon reconsideration of Yohpe's claims are also missing from the record.

[3]The regulations provide that "sedentary work"

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

to extreme cold and hazards, such as machinery and heights.  *Id.*  After hearing testimony by the vocational expert and consulting the Dictionary of Occupational Titles, the ALJ concluded that Yohpe was not disabled.  R. 23-24, Findings 10, 11.

The Appeals Council denied review on February 22, 2007.  R. 5-7.  On May 1, 2006, Yohpe timely appealed the Appeals Council's decision to the United States District Court.  Doc. No. 1, ¶3. On December 29, 2006, Yohpe filed in this Court a memorandum of law in support of his appeal. Doc. No. 22.  On March 5, 2007, the Commissioner filed a memorandum in support of her decision that Yohpe was not disabled.  Doc. No. 25.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Yohpe assigns three errors to the Commissioner.  First, Yohpe claims that the Commissioner erred by failing to articulate any "specific non-generic reasons" for rejecting the opinion of Dr. Gregory Lower, a consultative examiner who opined that Yohpe was disabled.  Doc. No. 22 at 1. Second, Yohpe claims that the Commissioner erred by rejecting the opinions of Dr. Richard Tessler and Dr. Dinash Yanamadula, Yohpe's treating physicians, and by failing to contact these physicians to clarify their opinions.  Third, Yohpe claims that the Commissioner erred by failing to meet his burden of proving that Yohpe could perform other work in the national economy.  More specifically, Yohpe argues that the ALJ's decision findings on Yohpe's abilities to push, pull, reach, handle, finger, and feel were vague and inconsistent with the hypothetical question posed to the vocational expert at the hearing.  *Id.* at 19-20.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ properly weighed the medical evidence and therefore

properly rejected Dr. Lower's "unsupported" conclusions.   Doc. No. 25 at 5.   Second, the Commissioner argues that the evidence submitted by Yohpe was inadequate and that the ALJ did not have a duty to contact Yohpe's treating physicians for clarification.   *Id.* at 6-7.   Third, the Commissioner argues that limitations related to the abilities to push, pull, reach, handle, finger, and feel do not significantly limit the number of sedentary jobs that Yophe can perform, and that the vocational expert's testimony provides substantial evidence to support the ALJ's findings.   *Id.* at 7-9.

## III.   <u>THE STANDARD OF REVIEW</u>

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d

-4-

835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

IV.   **APPLICATION AND ANALYSIS**

A.   **THE FACTS**

Yohpe was born on June 11, 1962 and was forty-three years old on the date of the ALJ's decision. R. 24, 55, 249-50. He completed high school and past work experience as a design drafter, cartographic designer, machinist, office manager, and community equipment service repairer. R. 17, 250-52.

In October 1999, Yohpe was involved in a motor vehicle accident, and sustained numerous life-threatening injuries, including burns over thirty percent of his body, a pubis fracture, open fracture of the femur, rib fractures, a maxillary fracture, a fracture of the acetabulum, an orbital fracture, a closed fracture of the radius and the ulna, a patellar fracture, a humerus fracture, and a scaphoid fracture. R. 84. Yohpe received multiple skin grafts for his burns and treatment, including rod fixation, for his fractures. R. 86, 89; *see also* R. 240-43. On November 16, 1999, he was transferred from his original hospital, Orlando Regional Hospital, to the Halifax Medical Center for a comprehensive rehabilitation evaluation. R. 86. At Halifax Medical Center, the doctors assessed impaired mobility and performance of his activities of daily living and a probable right radial nerve injury. R. 87. Yohpe was discharged to his home on November 25, 1999. He was instructed to undergo outpatient therapy and receive further treatment for his burns and other injuries. R. 85.

Almost two years later,[4] on October 12, 2001, Yohpe saw Dr. Richard Tessler, M.D., a hand

surgeon, upon referral from another doctor for evaluation of a nonunion of a scaphoid fracture[5] and

what appeared to be a SLAC wrist (degenerative arthritis in the wrist).[6]  R. 124.  Yohpe complained

of constant pain in his left wrist, but stated that he had normal sensation in his fingers.  *Id.*  He also

stated that his wrist bothered him when he drove with his left hand.  *Id.*  Dr. Tessler recommended a

wrist fusion or a proximal row carpectomy.[7]  R. 125-26.  Dr. Tessler explained that a wrist fusion

would alleviate Yohpe's pain, but would leave him unable to move his wrist.  On the other hand, the

doctor suggested, a proximal row carpectomy might not be as effective at relieving the pain, but would

still allow Yohpe some residual motion.  R. 126.

On October 26, 2001, Yohpe saw Dr. Tessler again, and reported that the constant pain in his

left wrist had gotten worse since his last visit.  R. 118.  He also complained that his wrist had become

"more stiff," but that he had normal sensation in his left hand.  *Id.*  Yohpe had some limited range of

motion in his wrist, and the doctor's impression was "Scapholunate dissociation left, with malunion

of the scaphoid fracture on the left."  R. 119-20.  Dr. Tessler again recommended a proximal row

carpectomy.  R. 120.

---

[4]Yohpe underwent a successful cataract extraction of his left eye on May 31, 2000 (R. 95-99), and he received treatment after a chemical splashed in his face while at work on February 12, 2001 (R. 100-01).  The next record submitted by Yohpe is from the October 12, 2001 visit with Dr. Tessler (summarized above).  *See* R. 24-26.

[5]"Nonunion"is defined as the "[f]ailure of normal healing of a fractured bone."  STEDMAN'S MEDICAL DICTIONARY 1218 (26th ed. 1995) ["STEDMAN'S"].  The "scaphoid bone" is a wrist bone.  *See id.* at 223.

[6]*See* http://www.emedicine.com/orthoped/byname/scapholunate-advanced-collapse.htm

[7]A "carpectomy" involves an "[e]xcision of a portion or all of the carpus."  STEDMAN'S at 285.

On October 29, 2001, Yohpe underwent a proximal row carpectomy of the left wrist.  Dr. Tessler, who performed the excision, diagnosed failed fixation of fracture of the left scaphoid with scarring and an affective scapholunate dissociation pre- and post-operatively, and he discharged Yohpe in "satisfactory condition."  R. 111-12, 116.

On May 8, 2002, Yohpe visited Dr. Tessler and reported a setback.  R. 102. He explained that he had been working on car motor the weekend before his visit, and that when he picked a heavy object, he experienced "immediate pain" in his wrist.  *Id.*  He also reported, however, that his wrist had "calmed down"; that he was "using it better"; that "his hand [was] better than before surgery"; and that he was "enjoying using his hand better."  *Id.*  Upon examination, Yohpe had pain with forced volar flexion, but he had no swelling or tenderness in his wrist.  *Id.*  He was also able to make a fist with his fingers.  *Id.*  Dr. Tessler advised Yohpe to return if his pain did not decrease quickly, but noted that he did not need to see Yohpe "unless there is a problem." *Id.*

On August 22, 2003, Yohpe filed his application for benefits, claiming disability as of July 28, 2002.  R. 55-56.  At the request of the Office of Disability Determinations, Darwin Caraballo, M.D., examined Yohpe on September 23, 2003. R. 127-32.  Yohpe stated that he could barely move his left hand in any direction; that walking was difficult for him, so he only walked very short distances; and that he was in constant pain in his hip and below, as well as in his right shoulder area.  R. 127.  On examination, Yohpe had full range of motion of all of his upper extremity joints and lower extremities, except in his right shoulder, right hip, and left hip.  R. 129, 131.  His grip strength was 5/5 bilaterally, and his fine manipulation was within normal limits.  R. 129.  His gait was slow but normal, and he limped off and on from the left side because his left leg was one inch shorter than the right leg.  *Id.*

X-rays of the left hand showed "significant osteopenia" of the bone, and x-rays of the left wrist showed evidence of "lack of bones present" and "[s]evere osteopenia of the bone and severe osteoarthritic changes and scar tissue present as well." *Id.* Dr. Caraballo diagnosed Yohpe with status post motor vehicle accident with multiple injuries and multiple bone fractures, short leg syndrome of the left lower extremity, status post bony extraction and severe decreased range of motion of the left wrist, status post second degree burns on the left upper extremity and the left thigh with chronic changes in the skin, and chronic joint pain "secondary to multiple injuries and all the metal devices that are currently in place." R. 129-130.

On October 9, 2003, Nicholas H. Bancks, M.D., a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment of Yohpe. R. 133-40. Dr. Bancks opined that Yohpe could lift and/or carry twenty pounds occasionally and ten pounds frequently; the he could stand, walk, and/or sit for approximately six hours in an eight-hour workday; and that he was limited in his upper and lower extremities.[8] R. 134. According to Dr. Bancks, Yohpe could frequently kneel and climb ramps and stairs; occasionally balance, stoop, crouch, and crawl; and never climb ladders, ropes, and scaffolds. R. 135. He was limited in his ability to reach overhead on his right side,[9] but otherwise had no manipulative, visual, or communicative limitations. R. 136-37. Yohpe further had to avoid concentrated exposure to hazards such as machinery and heights. R. 137.

---

[8]Dr. Bancks filled out a checklist form which requested that he "describe [the] nature and degree" of Yohpe's limitations in his upper and lower extremities. *See* R. 134. Dr. Bancks' handwritten notes regarding these limitations are difficult to read. Next to the boxes related to Yohpe's abilities to push and pull with his upper and lower extremities, Dr. Bancks wrote: "1/3 [indecipherable]." *Id.*

[9]Again, Dr. Bancks handwritten notes related to the ability to reach overhead are unclear. He wrote: "1/3 overhead R" to support his conclusion that Yohpe was limited in his ability to reach overhead on his right side. *See* R. 136.

-9-

On January 29, 2004, Yohpe went to the Halifax Medical Center emergency room with complaints of left wrist and knee pain. R. 141-43. Yohpe requested pain medication and referral for pain management therapy. R. 142. He stated that his pain had been worsening progressively over the last year, but denied any acute worsening pain. *Id.* On examination by Dr. Peter Springer, Yohpe had pain on flexion and extension of his wrist and infrapatellar discomfort. *Id.* Dr. Springer diagnosed chronic left wrist pain, chronic left knee pain, and history of prior motor vehicle accident in 1999, and prescribed Lortab for the pain, as well as a pain management program. R. 143.

Dr. Tessler examined Yohpe on February 3, 2004, and in a letter dated the same day, addressed to "Vocational Rehab" in South Daytona Beach, Florida, the doctor wrote that although Yohpe "seemed to be doing well" right after the surgery, "now . . . he is doing terrible." R. 144-45. Dr. Tessler further observed:

> He has constant pain in the left wrist. he has stiffness. He is not able to do anything at all that is strenuous with his left hand. He has normal feeling . . . in his left hand. He has constant numbness in the right hand, thumb, index, and long finger. This has been going on for a year. He also had problems from his shoulder.

*Id.*

On examination, according to Dr. Tessler's letter, Yohpe had a total of about fifteen degrees of motion of his left wrist and a positive tinel's sign at the right carpal tunnel. *Id.* He also had a positive phalen's sign and reduced range of motion. X-rays of the left wrist showed loss of radiocapitate joint space secondary to degenerative arthritis. R. 145. Dr. Tessler opined that Yohpe would be a "good candidate for Vocational Rehab," and stated that "[i]f we can get him back in the work force doing sedentary work[,] that would be an accomplishment and would make his life much better." *Id.* The doctor recommended a carpal tunnel release, shoulder treatment, and a wrist fusion.

*Id.* He concluded: "Hopefully we can get him back into the work force simply by addressing his shoulder problems and doing carpal tunnel release and [sic] then come back and work on his nondominant painful left wrist." *Id.*

On February 8, 2004, Yohpe returned to the Halifax Medical Center emergency room to request Lortab for "pain control." R. 146-47.  John Pennington, M.D., examined Yohpe and assessed status post trauma, chronic join pain.  R. 147.  He prescribed Sulindac and Ultram medication and referred Yohpe to "Keech Street for followup." *Id.*

An x-ray of Yohpe's right humerus, taken February 10, 2004, showed bone callus formation at site of his previous fracture, but was otherwise unremarkable.  R. 148.  An x-ray of his right shoulder from the same day indicated "Pain, internal fixation," bone callus formation, and evidence of mild impingement.  R. 149.

On February 25, 2004, Yohpe returned to the Halifax Medical center emergency room "for pain management." R. 152.  Yohpe told the doctor that he never filled his Ultram prescription because "[i]t does not help." R. 152-53.  The doctor diagnosed chronic pain and a history of trauma; gave Yohpe a prescription for Bextra medication; and referred Yohpe to pain management.  R. 153.

On March 5, 2004, Yohpe returned to Dr. Tessler who examined Yohpe's x-rays. R. 164. Dr. Tessler noted that the screw in Yohpe's right shoulder seemed to be tender and appeared to be giving Yohpe pain. *Id.* Dr. Tessler advised that before seeking further treatment for his wrist, Yohpe should see "Dr. Marshall," a specialist in shoulder and elbow surgery, about removing the rod and screws in his shoulder. *Id.* Yohpe expressed a preference for treating his left wrist first due to discomfort and

his inability to use the wrist.  *Id.*  Dr. Tessler "tentatively schedule[d] him for wrist fusion," and ordered a CT scan of Yohpe's wrist.  *Id.*

On March 11, 2004, another non-examining state agency physician, Thomas S. Edwards, M.D., assessed Yohpe's physical RFC.  R. 154-61.  Dr. Edwards opined that Yohpe could lift and/or carry twenty pounds occasionally and ten pounds frequently; and stand, sit, and/or walk approximately six hours in an eight-hour workday.  R. 155.  According to Dr. Edwards, Yohpe had "[f]requent limitations in use" in his upper and lower extremities.  *Id.*  In addition, he could frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  R. 156.  Yohpe was limited in his abilities to reach in all directions, handle, finger, and feel.  R. 157.  Dr. Edwards indicated that Yohpe had "[f]requent trouble [with] both wrists" and that Yohpe "need[s] surgery . . ."  *Id.*  Yohpe had no visual or communicative limitations, but he had to avoid concentrated exposure to extreme cold and to hazards such as machinery and heights.  R. 157-58.

In April 2004, Dr. Tessler reported that Yohpe's CT scan results showed "severe destruction of the left radiocapitate joint," "a complete loss of joint space between capitate and radius," and offset and hypertrophic spurring off the radius.  R. 163; *see also* R. 190.  On examination, Yohpe was markedly tender over the radiocapitulate joint and radial less multangular area.  Dr. Tessler noted that Yophe was "ready to have something surgically done" and that he was "miserable with pain" in the left wrist.  *Id.*  The doctor further stated that "it would be reasonable to do a wrist fusion" and that he would perform the fusion as soon as "Vocational Rehab" approved the procedure.  *Id.*  In a letter dated April 16, 2004, addressed to the State of Florida Food Stamp Division, Dr. Tessler wrote that

-12-

Yohpe was a good candidate for a wrist fusion and that "[i]n the meantime, he has not been able to work and does need assistance from the state until further notice while he is still under [Dr. Tessler's] care and can by retrained to re enter [sic] the workforce." R. 162.

Dr. Gregory Lower, an orthopedist, performed a consultative "Social Security Disability Evaluation" in September 2004. R. 165-176. Dr. Lower reviewed Yohpe's treatment history and observed that at that time, Yohpe did not "have active orthopedic followup for his multiple traumas due to financial constraints." R. 165. He further noted that Yohpe had to stop working because he was unable to perform computer data entry work as a result of numbness and reduced range of motion in both of his hands and difficulty sitting from his left femur and hip injury. *Id.*

Dr. Lower's physical examination revealed a moderate antalgic gait in his left lower extremity; grip strength of thirty pounds on his right and four pounds on his left; pinch strength of three pounds bilaterally; positive Tinel's and Phalen's sign; and decreased range of motion in his left knee. R. 167-69. Dr. Lower's findings from x-rays dated September 1, 2004, indicated a "Malunited healed right humerus fracture," moderate osteoarthritis to the acromioclavicular joint in the right shoulder, radiographic changes consistent with impingement syndrome in the right shoulder, severe narrowing of the capitate radial articulation in the left wrist, severe post-traumatic osteoarthritis in the left wrist, and moderate post-traumatic osteoarthritis in the left knee. R. 169-70. Based on his findings, Dr. Lower diagnosed Yohpe with: (1) status post third degree burns, thirty percent of which demonstrated "difficulty with persistent thermal regulatory problems"; (2) status post right humerus fracture with resulting impingement syndrome right shoulder; (3) carpal tunnel syndrome in the right wrist; (4) severe post traumatic osteoarthritis of left wrist with loss of range of motion and weakness of grip

-13-

strength; (5) status post "IM rodding left femur with chronic left hip pain and loss of range of motion"; and (6) moderate post-traumatic osteoarthritis of the left knee. R. 170-71. Dr. Lower concluded that Yohpe suffered from "severe residual multiple orthopedic traumas." R. 171. He added:

> Predominantly, the patient's upper extremities with his carpal tunnel syndrome of the right wrist and severe post traumatic osteoarthritis of the left wrist will give him difficulty with any fine or gross motor manipulation. Patient's lower extremity trauma would give him difficulty standing or walking long distances. It is by this orthopedic examiner that the patient's orthopedic condition is permanent and total in nature and would prevent him from gainful employment in any capacity.

*Id.*

Dr. Lower also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." R. 174-76. According to Dr. Lower, Yohpe could lift and/or carry less than ten pounds frequently and occasionally; stand and/or walk less than two hours in an eight hour workday; and never climb, balance, kneel, couch, or crawl. R. 174-75. Yohpe was also limited in abilities to sit, reach in all directions, handle (gross manipulation), finger (fine manipulation), and feel. R. 175-76. Dr. Lower further opined that Yohpe had environmental limitations with extreme temperatures, noise, dust, vibration, humidity or wetness, hazards, and fumes, odors, chemicals, or gases. R. 176.

On December 20, 2004, Yohpe was referred to Dr. Dinash Yanamadula for his right arm and left lower extremity radicular pain. R. 178. On examination, Yohpe demonstrated "decreased sensation diffusely to light touch in the bilateral hands" and a "mildly positive" Spurling's test, an evaluation for cervical nerve root impingement.[10] R. 179. Yohpe also had pain on palpation of bilateral lumbar facets. *Id.* Dr. Yanamadula assessed chronic pain syndrome, and stated that "[i]n

---

[10] *See* http://www.drugs.com/dict/spurling-test.html

light of the fact [that Yohpe] does not have insurance[,] it is very difficult to do any interventional procedures to help him." *Id.* The doctor recommended that Yohpe take pain and anti-inflammatory medication "in the meanwhile until [Yohpe] gets his SSI benefits." *Id.*

Yohpe visited Dr. Yamanandula approximately once a month between January 20, 2005 and July 8, 2005. R. 189A-84. During each visit, Yohpe complained of pain, and the doctor prescribed mediation. *See id.* On January 20, 2005, Yohpe reported that his Ultram medication did not help him and that he could not afford it. R. 189A. Dr. Yamanandula prescribed Darvocet instead, and observed that "[o]nce [Yohpe] gets the insurance benefits, we will go ahead starting [sic] treating him more aggressively with interventional treatment to help alleviate his pain so he does not have to depend on medication." *Id.*

On March 17, 2005, Dr. Yamanandula completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" in which he opined that Yohpe could sit for four hours total and twenty to thirty minutes at one time during an eight-hour workday; that Yohpe could lift twenty pounds occasionally and carry ten to twenty-five pounds occasionally; that Yohpe could stand for three hours total with frequent breaks and one to two hours at a time during an eight-hour workday; and that Yohpe could walk for one to two hours total and thirty minutes to one hour at a time during an eight-hour workday. R. 182-83. The doctor also stated that Yohpe could bend infrequently; push and pull "light weights"; and handle objects without limitation, with the exception of his right upper extremity which showed reduced range of motion and limited function. R. 183. Dr. Yamanandula concluded that Yohpe's prognosis was "poor." *Id.* During Yohpe's last visit with Dr. Yamanandula on July 8, 2005, the doctor refilled Yohpe's prescription for Darvocet medication and again noted that they were

-15-

"still awaiting his social security disability insurance approval so [that they could] do further testing." R. 184.

### B.      THE ANALYSIS

#### 1.      Dr. Lower

First, Yohpe is correct that the ALJ failed to articulate any "specific non-generic reasons" for rejecting the opinions of Dr. Lower.  Doc. No. 22 at 1.  In general, the ALJ must state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

In this case, the ALJ summarized the medical evidence; briefly stated Dr. Lower's opinions, as articulated in the doctor's Medical Source Statement; and concluded that "[a]lthough [Dr. Lower] opined that [Yohpe] was only capable of less than sedentary work, [Yohpe's] medical condition indicates less severe exertional limitations." R. 22.  The ALJ's statement is vague and fails to provide a specific reason for her rejection of all of Dr. Lower's opinions and findings.

The Commissioner argues that the ALJ's statement should be viewed in conjunction with her analysis of the evidence in the rest of her written decision, but this argument is unconvincing.  Without explaining how the record or specific evidence in the record (including Dr. Lower's own findings based on a physical examination and objective tests, as stated in his examination notes) contradicts Dr. Lower's opinions, the ALJ's broad statement is insufficient to allow this reviewing court to

determine whether the decision is supported by substantial evidence.[11]   Remand is necessary for further explanation regarding Dr. Lower's examination findings and opinions.

> 2.    Treating Physicians

Second, Yohpe claims that the Commissioner erred by rejecting the opinions of Dr. Tessler and Dr. Yanamadula, two of Yohpe's treating physicians, and by failing to contact the physicians to clarify their opinions.  The Commissioner mainly argues that she had no obligation to contact Yohpe's treating physicians, and, other than by arguing generally that the evidence submitted by Yohpe was inadequate, the Commissioner does not specifically address Yohpe's argument that the Commissioner erred by discrediting the two treating physicians' opinions.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Comm'r of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on

---

[11]   The Commissioner argues that "[e]ven a cursory reading of the preceding page and the following page in [the ALJ's] decision demonstrates that she looked to all the medical evidence of record, and assigned weight accordingly."  Doc. No. 25 at 5.  This argument, however, is misleading.  The "preceding page" includes the ALJ's finding that Yohpe has exaggerated his limitations and the "following page" indicates the ALJ's findings as that Yohpe cannot perform his past relevant work and the beginning of the ALJ's summary of her RFC findings.  *See* R. 21, 23.  The ALJ's evaluation or rejection of other evidence – such as her finding that Yohpe's "symptoms may not have been as limiting as the claimant has alleged in connection with this application" and her observation that Yohpe "ambulated normally, but slowly, and sat normally throughout the hearing" – does not sufficiently indicate why, for example, Dr. Lower was wrong as to Yohpe's need to avoid extreme temperatures, noises, dust, vibrations, humidity, wetness, hazards, fumes odors, chemicals, and gases. *See* R. 21, 176.

In addition, Plaintiff did not raise the issue on appeal, but the Court also notes that, on the "preceding page," the ALJ did not clearly apply the Eleventh Circuit's three-part "pain standard" to evaluate Yohpe's complaints of pain.  *See Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  The ALJ, instead, concluded vaguely that certain medical findings "are indicative that the claimant's complaints are not fully substantiated by the objective medical conclusions and his symptoms **may not** have been as limiting as the claimant has alleged in connection with this application."  *See* R. 21 (emphasis added).

the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

As the first issue raised by Yohpe requires remand, however, the Court cannot and need not determine whether substantial evidence supports the ALJ' s evaluations of Dr. Tessler and Dr. Yanamandula's medical source statements and opinions and whether the ALJ should have contacted the physicians for clarification of their opinions.  The Court does note, nonetheless, that the ALJ's evaluations of the two treating physician's opinions are cursory, in light of the length of the treatment relationship between Yohpe and both doctors.  *See* R. 21-22.  The Court further notes that, as the ALJ rejected the opinions of every physician who offered a medical source statement in the record, the better practice would have been to "recontact [the claimant's] treating sources or any other examining sources" pursuant to 20 C.F.R. § 404.1527(c)(3).

3.      VE Hypothetical

Third, Yohpe argues that the ALJ's decision findings on Yohpe's abilities to push, pull, reach, handle, finger, and feel were vague and inconsistent with the hypothetical question posed to the vocational expert at the hearing.  The Commissioner argues that limitations related to the abilities to

-18-

push, pull, reach, handle, finger, and feel do not significantly limit the number of sedentary jobs that Yophe can perform, and that vocational expert's testimony thus provides substantial evidence to support the ALJ's findings.

Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.  In this case, the ALJ correctly recognized that Yohpe's non-exertional impairments precluded exclusive use of the grids to establish that Yohpe could perform other work that exists in the national economy, and thus correctly relied on VE testimony.  *See* R. 23-24.

Nonetheless, Yohpe is correct that the limitations in the hypothetical question differ from those included in the ALJ's RFC finding.  The ALJ never clarifies how Yohpe is limited, despite the statement that Yohpe's abilities were "frequent rather than constant" in the hypothetical.  *See* R. 24, 277.[12]  Without a more precise RFC finding as to the frequency of Yohpe's relevant limitations, the Court cannot discern whether the VE testimony supports the ALJ's conclusion that Yohpe could perform other work and whether the Commissioner has met her burden.[13]  Further, without more

---

[12]During the hearing, the ALJ asked the VE to assume a person of similar age, education, and experience as Yohpe who could only perform sedentary work; who was occasionally limited in his abilities to push and pull; and who could never climb ladders, ropes, or a scaffold.  R. 276.  The ALJ added that "regarding reaching, handling, fingering, and feeling, [the individual] **would be limited to frequent rather than constant** as well as working overhead with the right upper extremity, so all of that would be frequent rather than constant." *Id.* (emphasis added).  The VE responded that the hypothetical individual would be able to work as a call out operator and a surveillance system monitor, and based on this VE testimony, the ALJ concluded that Yohpe was capable of performing other work existing in the national economy. *See* R. 24, 277.  The ALJ's RFC finding states that Yohpe was "**limited** in pushing and pulling with his upper and lower extremities and in **reaching, handling, fingering, and feeling**."  R. 20.

[13]The Commissioner argues that the limitations specified do not significantly erode the sedentary occupational base, as stated in Social Security Ruling 96-9p, and that the ALJ's failure to specify the precise degree of Yohpe's limitations therefore does not require remand.  *See* Doc. No. 25 at 8-10.  The Commissioner's statement is not quite accurate.  The Ruling provides, for example, that "[m]ost unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions"; that "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in significant erosion of the unskilled sedentary occupational base."  SSR 96-9p.

specific evaluations of the physicians' findings and opinions (as described above), this Court also

cannot evaluate whether the hypothetical question accurately depict Yohpe's impairments.  Remand

is necessary on this issue.

**V.      CONCLUSION**

For the reasons stated above, the decision of the Commissioner is reversed and remanded.  The

Clerk will enter a judgment accordingly and close the case.

**DONE AND ORDERED** this 9th day of July, 2007.

*Donald P. Dietrich*
                        
DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:


Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL                 33602

The Honorable Judith A. Showalter
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817